Christopher B. Dolan, Esq (SBN 165358)
Aimee E. Kirby, Esq. (SBN 216909)
**DOLAN LAW FIRM PC**
San Francisco, California 94102
Tel: (415) 421-2800
Fax: (415) 421-2830

Attorneys for Plaintiff
LUIS FLORES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS FLORES, an Individual,<br><br>      Plaintiff,<br><br> v.<br><br>UNITED STATES AIR FORCE and DOES 1 through 100, Inclusive,<br><br>      Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**<br><br>**NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW PLAINTIFF, Luis Flores, by and through his attorneys of record, who hereby file this Complaint and alleges as follows:

## **VENUE AND JURISDICTION**

1. This Court has Subject Matter Jurisdiction over this action pursuant to 28 USC § 1346(b)(1) and 28 USC § 1332. All proper pre-filing requirements were met, and Plaintiff is informed and believes that all claims have been denied or not otherwise acted upon.

2. The venue is proper because PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS were doing business in the County of Riverside, State of California, and the relevant actions set forth herein occurred in the County of Riverside.

3. PLAINTIFF is informed and believes and thereon alleges that DEFENDANTS are employers subject to suit under the California Labor Code in that DEFENDANTS were doing business in the County of Riverside, State of California. Furthermore, PLAINTIFF worked in the County of Riverside, State of California.

## PARTIES TO THE CIVIL ACTION

4. Plaintiff LUIS FLORES (hereafter PLAINTIFF) is a resident of the State of California.

5. Plaintiff is informed and believes that the March Air Reserve Base is owned and used by the Defendant UNITED STATES AIR FORCE and they at all times owned the subject aircraft. At all relevant times, the March Air Reserve Base was being used for training missions by the UNITED STATES AIR FORCE, and it was during one of these training missions that an F-16 lost control and collided with a civilian-owned building that Plaintiff LUIS FLORES was working in.

6. PLAINTIFF is informed and believes that Defendant UNITED STATES AIR FORCE is the general employer of the pilot operating the subject F-16 and the maintenance crew for said aircraft.

7. The true names and capacities, whether individual, corporate, associate or otherwise, of DOES 1-100, inclusive, are unknown to the PLAINTIFF, who therefore sues the DOE defendants by fictitious names. PLAINTIFF will amend this Complaint to show their true names and capacities when they have been ascertained. PLAINTIFF is informed and believes and thereon alleges that DOES 1-100 are business entities of unknown form and or individuals.

8. Defendants UNITED STATES AIR FORCE and DOES 1-100 are hereinafter collectively referred to as "DEFENDANTS."

9. PLAINTIFF is informed and believes, and thereon alleges, that except as alleged herein, at all times mentioned in this Complaint, DEFENDANTS were the agents and employees of

their co-Defendants, and were acting within the course and scope of such agency and employment, and acted in such a matter as to ratify the conduct of their co-Defendants. PLAINTIFF is informed and believes and thereon alleges that each Defendant aided and abetted each other such that the principal is liable for the acts of each Defendant.

## GENERAL ALLEGATIONS

1. On May 16, 2019, about 3:39 p.m., the subject mishap aircraft, a block 40 F-16, tail number 88-0477 (hereafter "F-16" or "aircraft"), assigned to the 114th Fighter Wing (FW), Jose Foss Field, Sioux Falls, South Dakota, and operated by a pilot from the 144 FW, Detachment 1, located at March Air Reserve Base (ARB) crashed into a commercial warehouse near March ARB while attempting to land.

2. PLAINTIFF was inside the subject commercial warehouse when the F-16, crashed into the warehouse.

3. The subject F-16 was returning from a local training mission as a two aircraft formation of F-16s on a practice aerospace combat alert launch and aircraft intercept training mission.

4. The subject F-16 flew to a military operating area and executed tactical intercepts, at both medium and low altitude, and local area familiarization before returning to the base.

5. The Detachment Commander of the United States Air Force authorized the training mission, and it was scheduled following the Ready Aircrew Program (RAP) tasking the memo.

6. The purpose of the subject F-16 was to practice an aerospace control alert scramble of two F-16 fighters and to conduct aircraft intercept training.

7. The F-16 pilots completed their mission preparation on May 16, 2019 and began their flight brief at 1000L following the 144 FW General Briefing Guide and F-16 Operations Procedures.

8. The preparation included reviewing the profile for the day's flight, filling out an operational risk management sheet, and ensuring all the required "Go/No-Go's" were complete.

9. The subject F-16's flight was a low-risk category mission requiring no additional approval.

10. The pilots checked the current and forecasted weather for their fly window and, after reviewing the forecasted weather, the mishap flight takeoff time was shifted by two hours due to inclement weather in the airspace.

11. The subject F-16C received the battle stations call and proceeded to step, preflight, and engine start for practice alert response.

12. The F-16s took off and followed a standard instrument departure procedure.

13. The F-16s then proceeded to a military operating area to the east for one versus one tactical intercept, low-level proficiency training, and local area familiarization.

14. On May 16, 2019, the date of the incident, the subject F-16C received cockpit warnings of a possible hydraulic system issue.

15. The pilot checked the hydraulic pressure gauges and noted low pressure in hydraulic system A of the aircraft's dual hydraulic system.

16. The pilot noticed fluctuation between 1500 and 2000 pounds per square inch (psi).

17. However, as the flight progressed, the pressure fluctuated between 1000 and 200 psi. The standard operating pressure is 3100 psi.

18. At approximately 17 nautical miles from the base, the pilot configured the speed brakes and lowered the landing gear in for visual inspection of the aircraft and to burn fuel more rapidly.

19. The pilot did not declare an in-flight emergency at this time and positioned the flight for a ten nautical mile straight in approach to roadway 32.

20. Shortly after lowering the landing gear, the hydraulic pressure gauge indicated a loss of pressure from system B with the pressure fluctuating around 2000 psi.

21. With the loss of hydraulic pressure in the A and B systems, the pilot referred to the aircraft checklist regarding dual hydraulic failure and complied with all appropriate checklist steps.

22. The secondary F-16 was directed to land first on roadway 32.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

23. The subject F-16C was set to land on roadway 14 to utilize the roadway 14 departure end arresting cable in the event of brake failure due to the hydraulics.

24. The decision to land first was due to the potential of the subject aircraft shutting down the only active runway by utilizing the arresting cable or an inability to taxi off the runway.

25. An emergency was then declared because of the failing hydraulic systems.

26. After the activation of the emergency power unit was made, the cable was raised, the pilot aligned the subject aircraft for a straight-in approach to roadway 14.

27. Roughly one nautical mile short of the runway, at 300 feet above ground level and 11 degrees angle of attack, the subject aircraft, without pilot input, began a roll to the left.

28. The pilot then attempted to maintain aircraft control by selecting an appropriate power setting and countering the roll to the left with stick input.

29. The subject F-16 responded by rolling hard to the right, inconsistent with the subject F-16's stick input, to approximately 40 degrees.

30. As the subject F-16's flight controls were unresponsive, the pilot assessed loss of aircraft control and ejected before impact at 250 feet above ground level.

31. Immediately thereafter the subject F-16 impacted the commercial warehouse at a relatively shallow dive angle with its right-wing slightly low.

32. The subject F-16 went through the roof and into the building causing a post-impact fire in the warehouse.

33. As a result of the subject crash, PLAINTIFF suffered economic and non-economic damages.

*Inspections and Documentation*

34. The integrated maintenance data system and historical records for the past 30 days were reviewed, and there were no recurring issues that were identified.

35. Review of the air force technical order 781 forms and integrated maintenance data system show that maintenance documentation was accomplished in accordance with maintenance directives.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

36. The preflight inspection and basic post-flight inspection include visually examining the aerospace vehicle and operationally checking certain systems and components to ensure no serious defects or malfunctions exist.

37. Phase inspections are a thorough inspection of the entire aerospace vehicle.

38. Walk-around inspections are an abbreviated preflight inspection and completed as required before launch in accordance with the applicable technical orders.

39. The alert preflight inspection contains minimum inspection requirements and is used when placing or maintaining aircraft on alert status.

40. The subject aircraft had flown 237.7 hours since the last phase inspection was accomplished on September 21, 2018.

41. Before the mishap, the aircraft had no reported maintenance issues, and all inspections were completed.

42. In January 2019, four months before the subject mishap, the 531st Commodities Maintenance Squadron, F-16 Flight Controls, at Hill Air Force Base, Utah, overhauled the subject aircrafts' right flaperon integrated servo actuator and conducted on-site operational testing before returning the integrated servo actuator to service.

43. The integrated servo actuator translates electrical commands from the pilot to move flight control surfaces.

44. Due to the significant amount of hydraulic fluid in the accident aircraft's right flaperon, the integrated servo actuator bay was removed for further evaluation.

45. The Integrated Servo Actuator (ISA) overhaul process consisted of complete disassembly, solvent wash, and inspection of parts for serviceability.

46. Upon completion of inspection and appropriate parts replacement, the Integrated Servo Actuator was reassembled and sent for testing to validate operational integrity as a series of automated tests are ran to ensure part reliability.

47. The 144 FW Det 1 maintenance team performed all required inspections, documentation, and servicing for the subject aircraft before flight.

48. A thorough review of maintenance activities and documentation revealed no major documentation errors.

49. The 531 Commodities Maintenance Squadron (CMMXS) completed the overhaul of the mishap Integrated Servo Actuator in January 2019.

50. Overhaul technicians receive around three months of on-the-job training and are required to assemble approximately five Integrated Servo Actuators before certification.

51. Once the trainer and supervisor agree the trainee can adequately complete all steps required without supervision, the trainee is certified to complete the overhaul process.

52. The certification training is recorded in employee production acceptance certification.

53. All personnel in the overhaul process were trained and qualified by the current process to perform their assigned tasks.

54. According to the air force petroleum office joint oil analysis program, samples from the subject aircraft and associated servicing carts were normal, and no unusual volatiles was noted.

55. Additionally, fuel samples from the subject aircraft heat exchanger and servicing vehicle were normal, and the material tested was satisfactory for use.

56. Hydraulic fluid samples from the subject aircraft and associated servicing equipment were within normal tolerances, and no volatile contamination was detected.

57. Hydraulic systems A and B samples were insufficient due to a lack of quantity to complete all tests but showed no signs of volatile contamination.

58. On March 21, 2019, the right Integrated Servo Actuator of the subject aircraft was reported as having a possible hydraulic leak.

59. During operational checks, it was determined the Integrated Servo Actuator required replacement due to the flaperon movement with no side-stick controller input.

60. On March 28, 2019, the right flaperon Integrated Servo Actuator was replaced by 144 FW, Detachment 1, maintainers with an overhauled integrated servo actuator.

61. Operational checks were accomplished with no discrepancies identified.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

62. After this Integrated Servo Actuator replacement, the subject aircraft flew ten sorties for 16.3 hours before the incident.

63. The replacement Integrated Servo Actuator had been previously overhauled by the 531 CMMXS.

64. The overhaul of the Integrated Servo Actuator (ISA) was signed on January 28, 2019.

65. Hydraulic system A contains approximately 5 gallons of fluid, and hydraulic system B holds approximately 7 gallons of fluid.

66. Both systems operate simultaneously to supply hydraulic power for the primary flight controls and LEFs.

67. If one system fails, the remaining system will provide sufficient hydraulic pressure but at a reduced rate of actuation.

68. System A also supplies power to the fuel flow proportioner and the speed brakes.

69. All remaining utility functions, consisting of the gun and gun purge door, air refueling system, landing gear, brakes, and nose wheel steering, are supplied by system B.

70. In the event of dual hydraulic failure, the emergency power unit will activate automatically or if the pilot commands it manually.

71. The emergency power unit hydraulic pump then supplements pressure to hydraulic system A, if there is hydraulic fluid remaining in the system.

72. The subject aircraft's data recorder and flight computer recorded ISA fails for both A and B hydraulic systems.

73. The ISAs for the left flaperon, and right horizontal tail rudder and their respective bays were inspected and found to be unremarkable. The oil cooler was also unremarkable.

74. The right flaperon ISA had no impact damages, and all hydraulic lines and safety wires were intact.

75. Hydraulic fluid had collected and remained in the bay containing the right flaperon ISA following the mishap. The left flaperon ISA was dry.

76. Due to the significant amount of hydraulic fluid in the right flaperon ISA bay, the ISA was removed and shipped for further evaluation.

77. There are two inlet check valves (ICV) in each ISA (one for hydraulic system A and one for hydraulic system B).

78. ICVs are designed to allow controlled, restricted fluid flow into the pressure inlets of the ISA to prevent backflow out of the pressure inlet ports.

79. The right flaperon ISA from the subject aircraft was removed, and the initial characterization of the part was performed by the ISA maintenance unit at 531 Commodities Maintenance Squadron (CMMXS).

80. During functional testing on the test stand, hydraulic fluid immediately began leaking from both inlet check valves when pressurized to 1000 psi.

81. To get a rough estimate of the rate of fluid loss, the unit was held at 1000 psi for five minutes while leaking hydraulic fluid was collected.

82. The collected volume measured 155 ml, not including the estimated 3 to 7 ml that was spilled or remained on the unit.

83. This indicated a leak rate of approximately 31 ml/minute at 1000 psi, though the normal operating pressure is approximately 3000 psi.

84. The hydraulic fluid leaked from where the screw cap threads into the bodies of the inlet check valves.

85. No other leaks were found on the ISA.

86. After testing was complete, the inlet check valves were returned to the lab for further evaluation.

87. Each ICV consists of a cap, screw threads, a retainer ring, and an 0-ring.

88. These parts are collectively referred to as a "screw cap."

89. The screw cap screws into the ICV body.

90. The screw cap retainer sits above the 0-ring and helps to keep it in place.

91. It is primarily the screw cap retainer and 0-ring that prevent hydraulic fluid from leaking out the ICV under high pressure.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

92. Post-accident inspection revealed that the screw cap for the system A ICV was not seated properly into the body of the valve.

93. Upon removal of the screw cap from the system A ICV, the retainer was found to be permanently deformed, and the ends of the retainer were spread apart.

94. In addition, a portion of the 0-ring was missing, and the upper face of the 0-ring exhibited several permanent impressions of the underside of the retainer.

95. By rotating the 0-ring to line up its impressions with the underside of the retainer, the missing portion lined up with the gap between the retainer ends.

96. The retainer and 0-ring were measured and compared to unused items and were determined to be correct parts.

97. The post-accident inspection also revealed that the screw cap for the system B ICV was not seated properly into the body of the valve.

98. The screw cap was removed from the system B ICV and showed similar characteristics as the system.

99. The retainer was permanently deformed up over the adjacent ridge, with the ends of the retainer spread apart.

100. The upper face of the 0-ring exhibited several permanent impressions of the underside of the retainer.

101. A portion of the 0-ring was missing.

102. Once again, by rotating the 0-ring to line up with the underside of the retainer, the missing portion lined up with the gap between the retainer ends.

103. The subject aircraft's pressure switches for hydraulic systems A and B were tested, and both showed improper calibration.

104. During testing, the switch closed when the pressure fell below 750 psi, which is lower than the specified range.

105. Four additional pressure switches from the supply system were submitted for testing, and they all met the specification requirements concerning the pressure at which they would illuminate the caution light inside the F-16 cockpit.

106. The ICVs from both systems of the ISA exhibited the same mode of failure. The retainer on the screw cap had deformed, and the ends spread apart. Near the gap between retainer ends, fragments had torn away from the 0-rings allowing hydraulic fluid to leak out through the threads between the screw caps and the valve bodies. The inner threads of both valve bodies exhibited anomalies.

107. The retainer deformed because the screw caps in both of the two ICVs from the ISA were not fully seated as installed within their respective valve bodies.

108. High pressure in service caused the retainer to flow into the cavity of the low-pressure side of the seal, leaving the 0-ring unevenly supported and subject to progressive degradation.

109. Degradation to the 0-rings eventually prevented them from sustaining the working fluid pressure, and hydraulic fluid leakage occurred through the gaps in the 0-ring and retainer.

110. The current ICV design has the potential for the retainer to catch inside the screw cap gland during installation. If the retainer catches, it can cause the screw cap to not fully seat and leave the 0-ring unsupported. Over time, this can lead to failure of the 0-ring and retainer, causing a leak. This leak has the potential to lower pressure in the respective hydraulic systems.

111. Currently, an overhaul technician verifies the screw cap has been installed correctly by ensuring the proper torque was applied to the screw cap when it is installed.

112. The amount of torque utilized is slight, and therefore technicians must develop a "feel to it."

113. After the ISA is reassembled during the overhaul process, it is tested to validate operational integrity, which includes the performance of a leak test.

114. Since the effect of an unsupported O-ring is progressive degradation, the ISA can pass the leak test during the overhaul process but still develop a leak over time.

115. Consequently, under current overhaul procedures, it is possible for the screw caps to be not fully seated even though the proper torque was applied, and the ISA passed the post-assembly leak test.

116. The Accident Investigation Board president found by a preponderance of the evidence, the cause of the accident was the improper installation of two hydraulic check valves in the right Flaperon Integrated Servo Actuator (ISA), which resulted in a loss of sufficient hydraulic pressure to control the subject aircraft.

117. A preponderance of the evidence also indicated an inadequate overhaul process that lacked an effective procedure to identify improper installation of check valves was a substantial contributing factor.

118. The subject airplane was owned and controlled by the United States Air Force.

119. DEFENDANTS took no steps to ensure that the subject aircraft would be suitable for flight before use.

120. PLAINTIFF is informed and believes that DEFENDANTS failed to implement a reasonable policy or program to inspect the subject aircraft and failed to implement a reasonable protocol for regular inspection.

121. PLAINTIFF is informed and believes that DEFENDANTS failed to maintain the subject aircraft reasonably and failed to implement a reasonable protocol for regular maintenance.

## CAUSE OF ACTION

### Negligence

### (Against All Defendants)

122. By this reference, the PLAINTIFF hereby incorporates each and every paragraph set forth above as though fully set forth at this place.

123. As set forth above, DEFENDANTS, and each of them, breached a duty they owed to PLAINTIFF. DEFENDANTS breached that duty in various ways, including, but not limited to:

a) Failure to train or certify on the subject pilot of the aircraft, or otherwise assure that he was trained and educated on its use;

b) Failure to have in place a protocol for regular preventative or necessary maintenance of the subject aircraft;

c) Failure to have in place a reasonable inspection protocol to reveal defects in the subject aircraft;

      d)    Failure to discontinue use of the subject aircraft despite a defect that was known, or should have been known.

      e)    Failure to have a maintenance program that would correctly install and test for defect component parts of the subject aircraft.

These breaches of the duty to PLAINTIFF caused him significant injury.

124. The unlawful conduct of DEFENDANTS, and each of them, as alleged above, directly and proximately caused PLAINTIFF to suffer, and continue to suffer special damages including but not limited to past and future loss of income, bonuses and other compensation, benefits, and other damages to be proven at the time of trial.

125. The unlawful conduct of DEFENDANTS, and each of them, as alleged above, directly and proximately caused the PLAINTIFF to suffer and continue to suffer, general damages including but not limited to shock, embarrassment, humiliation, emotional distress, stress and other damages to be proven at trial.

WHEREFORE, PLAINTIFF prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays and make the following demand:

a) That process be issued and served as provided by law, requiring DEFENDANTS to appear and answer or face judgment;

b) That PLAINTIFF have and recover a judgment against DEFENDANTS in an amount to be determined at trial as general damages for their wrongful conduct;

c) That PLAINTIFF have and recover a judgment against DEFENDANTS in an amount to be determined at trial as special, actual, compensatory and/or nominal damages for their wrongful conduct;

a) That PLAINTIFF have and recover a judgment against DEFENDANTS for all pre-judgment and post-judgment interest; and

///

- 13 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1       b)    That PLAINTIFF has such other relief as provided for by law and/or this Court deems just and proper.

DATED: May 7, 2021                       **DOLAN LAW FIRM, PC**

BY: _____
     Christopher B. Dolan, Esq.
     Aimee E. Kirby, Esq.
     Attorneys for Plaintiff
     LUIS FLORES

## DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands Trial by Jury.

DATED: May 7, 2021                       **DOLAN LAW FIRM, PC**

BY: _____
     Christopher B. Dolan, Esq.
     Aimee E. Kirby, Esq.
     Attorneys for Plaintiff
     LUIS FLORES